**Sealed**
Public and unofficial staff access to this instrument are prohibited by court order

United States Courts
Southern District of Texas
FILED

*May 04, 2023*

Nathan Ochsner, Clerk of Court

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § § | Criminal No. **4:23cr195** |
| v. | § § | |
| **CASEY DAVID MARTIN** | § § § | **UNDER SEAL** |

### SEALED INDICTMENT

**THE GRAND JURY CHARGES:**

At all times material to this Indictment:

### THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

1.  The United States Food and Drug Administration ("FDA") was the agency of the United States responsible for, among other things, enforcing the provisions of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.* FDA's primary purpose in enforcing the FDCA was to protect the health and safety of consumers in the United States. FDA's responsibilities included regulating the manufacturing, labeling, and distribution of food and drugs shipped or received in interstate commerce. The requirements of the FDCA, in part, are meant to ensure that food and drugs are safe for their intended uses and bear labeling that contains accurate and adequate information.

2.  The FDCA defined a "drug" in relevant part, as (1) any article intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease in man or other animal; (2) any article (other than food) intended to affect the structure or any function of the body; or (3) any article used as a component of either. 21 U.S.C. § 321(g).

3.  Whether an article was a drug was determined by its intended use, which was defined at the time of the offense as "the objective intent of persons legally responsible for the

labeling of drugs." The intent was determined by "such person's expressions or may be shown by the circumstances surrounding the distribution of the article." Such intent could be shown by labeling claims, advertising matter, or oral or written statements by such persons or their representatives. 21 C.F.R. § 201.128.

4. The FDCA defined "food" in relevant part as "articles used for food or drink for man or other animals" and "articles used for components of any such article." 21 U.S.C. § 321(f)(1).

5. A substance intended to become a component of a food is a food additive unless: (1) it is generally recognized among experts qualified by scientific training and experience to evaluate its safety as having been adequately shown to be safe under the conditions of its intended use; (2) it is subject to prior sanction; or (3) it is an ingredient described in 21 U.S.C. § 321(ff) (a dietary ingredient). 21 U.S.C. § 321(s). The other exceptions listed in 21 U.S.C. § 321(s) do not apply.

6. A food additive is deemed unsafe unless it is used in conformity with a regulation prescribing conditions under which it may be safely used, it has been granted an exemption for investigational use under 21 U.S.C. § 348(j), or it is a food contact substance. 21 U.S.C. § 348(a).

7. A food is adulterated if it contains a food additive that is unsafe within the meaning of 21 U.S.C. § 348. 21 U.S.C. § 342(a)(2)(C)(i).

8. The FDCA prohibited the following acts and the causing thereof:

   a. The doing of any act with respect to a food or drug, if such act is done while such article is held for sale after shipment in interstate commerce and results in such article being adulterated or misbranded, 21 U.S.C. § 331(k);

9. Title 18 of the United States Code prohibited the fraudulent and knowing importation into the United States of any product contrary to law. 18 U.S.C. § 545.

**SARMs, DMAA, and DMHA**

10. Selective Androgen Receptor Modulators ("SARMs") are a class of compounds that had similar properties to anabolic steroids, but were not classified as anabolic steroids under the Controlled Substances Act. The FDA has received adverse events associated with SARMs such as life-threatening conditions, including liver toxicity, heart attack and stroke. DMAA and DMHA has been found in numerous dietary supplement products, often marketed for sports performance and weight loss. Furthermore, DMAA (1,3-dimethylamylamine) is an amphetamine derivative that can raise blood pressure and lead to cardiovascular problems ranging from shortness of breath and tightening in the chest to heart attack. The FDA has also received adverse events associated with DMAA to include deaths.

11. SARMs, DMAA, and DMHA are substances that do not meet the definition of a dietary ingredient under 21 U.S.C. § 321(ff). Dietary supplements or foods that contain the unsafe food additives DMAA or DMHA are adulterated under the FDCA. 21 U.S.C. § 342(a)(2)(C)(i). Products containing the non-dietary ingredients SARMs that are intended to be used for weight loss or to increase muscle mass (structure function claims) are considered to be drugs under the FDCA.

12. Cardarine (GW-501516), Ligandrol (LGD-4033), Ostarine (MK-2866), and Testolone (RAD-140), among others, were SARMs manufactured by **CASEY DAVID MARTIN**.

13. Food products that did not meet the definition of dietary supplements contained the unsafe food additives DMAA and DMHA were manufactured by **CASEY DAVID MARTIN**.

## DEFENDANT'S PRODUCTS

14. Ostarine (MK-2866) was a product manufactured by **CASEY DAVID MARTIN** under the label name Jintro Pharmaceuticals, a product line owned, marketed, and sold by Co-Conspirator 1. The "Suggested Use" section on the label gave the following dosing instructions:

"Take ½ dropper .5ml twice daily with meals. Do not exceed 1 full dropper per day. You may cycle this product for 4-6 weeks before taking 4 weeks off."

MK-2866 was intended for use to increase muscle mass, and as such, was a drug under the FDCA. In an attempt to avoid government scrutiny, **CASEY DAVID MARTIN** caused the words "RESEARCH PRODUCT" and "RESEARCH PRODUCT FACTS" to be placed on MK-2866's label.

15. Big D*ick Energy (BDE) was a product manufactured by **CASEY DAVID MARTIN** under the label name Longevity, a product line owned, marketed, and sold by Co-Conspirator 1. BDE was a pre-workout product consumed to provide energy, and as such, was a food under the FDCA. BDE stated that one scoop was 13 grams (serving size) and the amount per container was 30 scoops. BDE was labeled to contain DMAA and DMHA. In an attempt to avoid government scrutiny, the product label stated it was "a Research product and not a Dietary Supplement."

## THE SMALL BUSINESS ADMINISTRATION

16. The United States Small Business Administration ("SBA") is an executive branch agency of the United States. The mission of the SBA is to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters. As part of this effort, the SBA enabled and provided for loans through banks, credit unions, and other lenders. These loans had government-backed guarantees.

## PAYCHECK PROTECTION PROGRAM

17. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or about March 2020 that was designed to provide emergency financial assistance to millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One of the financial sources of relief provided by the CARES Act was the Paycheck Protection Program ("PPP").

18. PPP loan proceeds were authorized to be used for a business' employee payroll, mortgage interest, lease, and utilities expenses. The principal amount and interest of a PPP loan was entirely forgivable if the business spent the loan proceeds on those authorized expenses within a designated period, and also spent a certain percentage of the PPP loan proceeds on payroll expenses.

19. In order to obtain a PPP loan, an application required an authorized representative of a business applying for the loan to affirm, among other items, the following:

    a. The business was in operation on February 15, 2020, and had employees for whom it paid salaries. Further, the applicant was required to state the average monthly payroll expenses and the number of employees employed by the business. These figures were used to calculate the amount of money the applicant business was eligible to receive under PPP;

    b. The funds would be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, or utility payments, as specified under PPP rules. The authorized representative of the business was required to sign the application stating they understood that if the funds were knowingly used for unauthorized purposes the federal government may hold the signee legally responsible for fraud; and

    c.  The information provided in the application and all supporting documents and forms are true and accurate in all material aspect. Knowingly making false statements to obtain a loan from SBA is punishable under federal law.

20. Although the SBA oversaw the PPP, PPP loan applications were processed by participating financial institution lenders, including Lender #1, who received and processed PPP loan applications and supporting documentation. If a PPP application was approved, the participating lender funded the PPP loan through its own monies, which were 100% guaranteed by the SBA. Data from the PPP loan application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA while processing the PPP loan.

21. Lender #1 was a financial institution insured by the Federal Deposit Insurance Corporation ("FDIC") and headquartered in Liberty, Texas.

## CUSTOMS AND BORDER PROTECTION

22. The U. S. Customs and Border Protection (CBP) was established via 6 U.S.C. §211. The "duties" of CBP were to coordinate and integrate security, trade facilitation, and trade enforcement functions. The Automated Commercial Environment ("ACE") is the system through which the trade community reports imports and exports and the government determines admissibility. CBP Trade applies expertise, technology, and automation to create streamlined and efficient processes to facilitate the global exchange of safe and legitimate goods. CBP uses the ACE system to enforce the laws defined in the FDCA

## THE DEFENDANT, RELATED INDIVIDUALS, AND ENTITIES

23. **CASEY DAVID MARTIN** was a resident of Harris County, Texas.

24. Co-Conspirator 1 was a resident of Hidalgo County, Texas, and the owner and operator of a workout supplement retailer, Retail Store 1, located within the McAllen Division of the Southern District of Texas and elsewhere.

25. Retail Store 1 is a Limited Liability Company and a supplement retail location owned and operated by Co-Conspirator 1 in the Southern District of Texas to include Hidalgo County.

26. PL Distribution LLC ("PL Distribution") was a workout supplements and drug manufacturer owned and operated by **CASEY DAVID MARTIN**, along with Co-Conspirator 2, owned Science Production Products LLC ("SPP") located on FM 2100 in Huffman, Texas, and doing business throughout the United States, including the Southern District of Texas, and elsewhere. PL Distribution and SPP did business under various names, including, but not limited to, SP Products, SP Labs, Private Label Supps, and PLS (collectively, "SP Labs").

27. In connection with operating SP Labs, **CASEY DAVID MARTIN** utilized several entities, including, but not limited to, PL Distribution, Armed Sports LLC, and Sarm Pharm L.L.C., all Texas limited liability companies.

28. **CASEY DAVID MARTIN**, by and through one of his companies, created private label companies, including, but not limited to Jintro Pharmaceuticals, a product line owned, marketed, and sold by Co-Conspirator 1.

29. Co-Conspirator 2 was a resident of Lee County, Alabama, and an employee of SP Labs.

30. Co-Conspirator 3 was a resident of Harris County, Texas, and an employee of SP Labs.

31. Robinhood Markets, Inc. ("Robinhood") is an American financial services company headquartered in Menlo Park, California, that facilitates commission-free trades of stocks, exchange-traded funds, and cryptocurrencies.

## COUNT 1
## CONSPIRACY TO SMUGGLE GOODS INTO THE UNITED STATES
## (18 U.S.C. § 371 and 18 U.S.C. § 545)

32. Paragraphs 1 through 30 are incorporated herein by reference.

33. From on or about January 1, 2017, through on or about March 24, 2021, in the Southern District of Texas and elsewhere, the defendant,

**CASEY DAVID MARTIN,**

and others known and unknown to the Grand Jury, did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with each other and others, known and unknown to the Grand Jury, to defraud the United States by impairing, impeding, obstructing, and defeating, through deceitful and dishonest means, the lawful functions of the United States Food and Drug Administration, an agency of the United States Department of Health and Human Services, and the Customs Border Protection in the United States Food and Drug Administration's oversight and regulation of food and drugs, in violation of Title 18, United States Code, Section 371, and to commit offenses against the United States, that is:

Fraudulently or knowingly importing or bringing into the United States, any merchandise contrary to law, or receiving, concealing, buying, selling, or in any manner facilitating the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law; and

in violation of Title 18, United States Code, Section 545.

All in violation of Title 18, United States Code 545.

## PURPOSE OF THE CONSPIRACY

34. It was a purpose and object of the conspiracy for the defendant and his Co-conspirators to unlawfully enrich themselves by, among other things:

(a) purchasing components from a supplier in China and importing these components into the United States;

(b) causing the mislabeling of these components before and during importation into the United States to avoid detection by the United States Customs and Border Protection ("CBP");

(c) using these components in drug products and adulterated food that were subsequently distributed and held for sale in the United States;

(d) selling drugs and adulterated food with knowingly false labeling that stated that each product was a "Research Product."

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendant CASEY DAVD MARTIN and his Co-Conspirators sought to accomplish the object and purpose of the conspiracy, included, among other things:

35. **CASEY DAVID MARTIN** oversaw and directed operations at SPP, SP Labs, PL Distribution, and all related entities.

36. **CASEY DAVID MARTIN** oversaw and directed operations at all private labels made by SPP, SP Labs, PL Distribution, and all related entities.

37. Jintro Pharmaceuticals was a private label manufactured by **CASEY DAVID MARTIN** and owned, marketed, and sold by Co-Conspirator 1.

38. **CASEY DAVID MARTIN** solicited and recruited employees for the purpose of growing his supplement manufacturing operation.

39. The employees **CASEY DAVID MARTIN** recruited included Co-conspirator 2 and Co-conspirator 3, among others.

39. **CASEY DAVID MARTIN** and his co-conspirators knowingly imported mislabeled raw ingredients from China.

40. **CASEY DAVID MARTIN** and the Chinese manufacturer used false and fictitious declarations to disguise the contents of the imported products.

41. At **CASEY DAVID MARTIN's** direction, the raw ingredients were shipped in packaging with false declarations such as "L-Histidine" as they entered a port-of-entry.

42. The packages would be sent directly to the warehouse or through a freight-forwarder.

43. The Chinese manufacturer would affix a numbering system to the package and send MARTIN a message, via WeChat, with the package's true contents.  For example, three packages may arrive at the warehouse numbered "123", "456", and "789" all labeled as "L-histidine," but MARTIN would not know the package's true contents until **CASEY DAVID MARTIN** received a WeChat message that "123" was 1,3 DMAA, "456" was SARM Ostarine, and "789" was SARM Cardarine.

44. **CASEY DAVID MARTIN** operate the websites www.privatelabelsupps.com and www.officialdarkenergy.com to market and sell the imported products.

45. On or about February 28, 2018, Co-Conspirator 2 departed the United States to travel to China, via commercial airlines, with empty bins labeled as "protein."

46. On or about March 4, 2018, Co-Conspirator 2 returned to the United States with the bins labeled "protein" to elude CBP at the port-of-entry.

47. It was further part of the scheme that defendant **CASEY DAVID MARTIN**, as the owner and operator of www.privatelabelsupps.com, published the following claims, among others:

"the private label supplement company with the mission of helping brick and mortar nutrition stores grow and succeed," "retail store exclusive," "[a]ll of our USA imported raws come [from] FDA registered facilities assuring TOP quality."

48. It was further part of the scheme that defendant **CASEY DAVID MARTIN**, as the owner and operator of www.officialdarkenergy.com, published the following claims, among others: "world's most hardcore research product."

49. The claims on the websites www.privatelabelsupps.com and www.officialdarkenergy.com were materially false and misleading, designed to avoid government scrutiny of **CASEY DAVID MARTIN's** manufacturing and sale of misbranded and adulterated food.

50. During the time period of the scheme, defendant **CASEY DAVID MARTIN** and others known and unknown to the Grand Jury, through SPP, and its affiliated entities, sold over $15.5 million in adulterated food and misbranded drugs.

51. From July 2018-September 2020, Co-Conspirator 1 sold at Retail Store 1 adulterated food and misbranded drugs manufactured for him by SP Labs, a company owned by **CASEY DAVID MARTIN**.

52. Co-Conspirator 1 conspired with SP Labs on which ingredients he wanted to include in his private labels, including, Jintro Pharmaceuticals, Longevity, Supremacy Burn, and Cocaine.

53. Co-Conspirator 1 conspired SP Labs regarding the wording and design of the labels on his private label, including, Jintro Pharmaceuticals, Longevity, Supremacy Burn, and Cocaine.

54. Co-Conspirator 1 and **CASEY DAVID MARTIN** discussed FDA's regulation of DMAA, SARMs, and China's new ban of exporting SARM ingredients.

55. From July 2018-September 2020, Co-Conspirator 1 paid Science Production Products LLC in total $133,533 (approximately), and PL Distribution LLC in total $123,028 (approximately).

## SHIPMENTS IN FURTHERANCE OF THE SCHEME

56. On or about the dates set forth below, in the Southern District of Texas, defendant **CASEY DAVID MARTIN**, and others known and unknown to the Grand Jury, for the purpose of smuggling raw ingredients into the United States with intent to defraud the United States as it relates to drug and food manufacturing, clandestinely introduced into the United States raw products via fraudulent invoice:

| Count | Approximate Importation Date | True Product | Falsely Declared As |
|---|---|---|---|
| 1 | 10/10/2020 | Ostarine | L-Histidine |

All in violation of Title 18, United States Code, Section 545.

## COUNT 2
## CAUSING A DRUG TO BE MISBRANDED AFTER SHIPMENT IN INTERSTATE COMMERCE
**(21 U.S.C. §§ 331(k) and 333(a)(2))**

57. Paragraphs 1 through 56 are incorporated herein by reference.

58. On or about the dates set forth below, in the Southern District of Texas and elsewhere, Defendant

**CASEY DAVID MARTIN,**

with Co-Conspirators, known and unknown to the Grand Jury, with the intent to defraud and mislead, did, while the drug was held for sale and after its component had been shipped in interstate commerce, cause the product's labeling to be false and misleading in any particular, in that the labeling falsely stated it was a "research product" when in fact it was intended to be used to

Page  12

increase muscle mass, which act resulted in the drug being misbranded within the meaning of Title 21, United States Code, Section 352(a).

In violation of 21 U.S.C. §§ 331(k) and 333(a)(2).

| Count | Approximate Date | SPP Product Name | Active Ingredient on Label | Other Labeling |
|---|---|---|---|---|
| 2 | May 18, 2020 | JINTRO PHARMACEUTICALS MK-2866 Ostarine MK-2866 | Ostarine MK-2866 | "Research Product" |

All in violation of 21 U.S.C. §§ 331(k) and 333(a)(2).

## COUNT 3
## CAUSING A FOOD TO BE ADULTERATED AFTER ITS SHIPMENT IN INTERSTATE COMMERCE
## (21 U.S.C. §§ 331(k) and 333(a)(2))

59.　Paragraphs 1 through 58 are incorporated herein by reference.

60.　On or about May 29, 2020, in the Southern District of Texas and elsewhere, CASEY DAVID MARTIN did, with the intent to defraud and mislead, while the food was held for sale and after it was shipped in interstate commerce, that caused a product known as Longevity B.D.E. Big D*ck Energy to contain an unsafe food additive, that is DMAA, which act resulted in the food being adulterated within the meaning of Title 21, United States Code, Section § 342(a)(2)(C)(i).

61.　The food was adulterated in that it contained the unsafe food additive DMAA.

All in violation of 21 U.S.C. §§ 331(k) and 333(a)(2).

# COUNT 4
## KNOWINGLY MAKES FALES STATEMENT OR REPORT FOR THE PURPOSE OF INFLUENCING A FEDERAL RESERVE BANK OR THE SMALL BUSINESS ADMINISTRATION
### (18 U.S.C. § 1014)

62. Paragraphs 1 through 61 are incorporated herein by reference.

63. Between April 1, 2020, and March 31, 2021, said dates being approximate, the defendant,

**CASEY DAVID MARTIN**,

was the purported owner and operator of PL Distribution, LLC ("PL Distribution"). This business was in Harris County, Texas, within the Southern District of Texas.

### MANNER AND MEANS

64. During the aforementioned period of the time, **CASEY DAVID MARTIN** submitted and caused to be submitted various applications and supporting documents as he applied for PPP assistance, through use of the internet and interstate wires.

65. On or About April 8, 2020, **CASEY DAVID MARTIN**, as owner of PL Distribution, signed PPP Loan Application in the amount of $47,027.32 for a 24-month term and submitted it to Lender #1.

66. On or about April 17, 2020, SBA PPP loan proceeds of $47,027.32 were deposited into **CASEY DAVID MARTIN's** PL Distribution business account #916552 held at Lender #1.

67. On or about May 5, 2020, **CASEY DAVID MARTIN** transferred and caused to be transferred the $20,000.00 of the loan proceeds referenced in Paragraph 66, to an account at Robinhood in the name of "Casey Martin,", account ending in #119599116. These funds were to be used for eligible business expenses, defined as "Allowable Costs" in the PPP loan note.

68. On or about May 21, 2020, **CASEY DAVID MARTIN** transferred and caused to be transferred the $25,000 of the funds referenced in Paragraph 66 to an account at Robinhood

ending in #119599116.  These funds were to be used for eligible business expenses, defined as "Allowable Costs" in the PPP loan note.

69. On or about January 8, 2021, **CASEY DAVID MARTIN** transferred and caused to be transferred $2,000 of the loan proceeds referenced in Paragraph 66, to an account at Robinhood ending in #119599116.

70. On or about October 23, 2020, **CASEY DAVID MARTIN** submitted documentation to Lender #1 to forgive the above-described PPP loan. In that documentation, **CASEY DAVID MARTIN** stated that all the funds were used to pay costs that are eligible for forgiveness." However, the funds were not used to pay costs that are eligible for "forgiveness." Specifically, an amount greater than $10,000 was used for purposes outside the scope of the "Allowable Costs" of the PPP loan, namely the $47,000, referenced in paragraphs 67-69, in loan proceeds were used to fund of a personal investment account.

71. On or about January 7, 2021, Lender #1 sent **CASEY DAVID MARTIN** a letter stating that the SBA approved the loan forgiveness, and the entire amount referenced in paragraph 66 was forgiven.

## STATUTORY ALLEGATIONS

72. The factual allegations of paragraphs 1 through 30, are incorporated herein by reference.

73. The Grand Jury incorporates by reference and re-alleges paragraphs 63-71 as though set forth in its entirety here.

74. On or about May 21, 2020, in Harris County, within the Southern District of Texas, and elsewhere, the defendant,

**CASEY DAVID MARTIN,**

having devised and intended to devise the above-described scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and, for the purpose of executing the above-described scheme and artifice to defraud, and attempting to do so, caused to be transmitted by means of wire communications in interstate commerce the following writings, signs, signals, pictures, and sounds:

| Count | Approximate Date | Description |
|---|---|---|
| 4 | May 5, 2020 | An internet transfer of $20,000.00 of PPP loan proceeds from an account #916552 at Lender #1 to an account at Robinhood ending in #119599116 |

All in violation of Title 18, United States Code, Section 1014.

## NOTICE OF FORFEITURE
### 18 U.S.C. §§ 981, 982 and 28 U.S.C. § 2461

Pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(2), 982(a)(7) and Title 28, United States Code, Section 2461(c), the United States gives notice to the Defendant,

**CASEY DAVID MARTIN**

that in the event of conviction of Conspiracy to Smuggle Goods into the United States (18 U.S.C. § 545), Knowingly Making a False Statement or Report for the Purpose of Influencing a Federal Reserve Bank or the Small Business Administration (18 U.S.C. § 1014), and/or Importation, Manufacture, and Sale of Misbranded Drugs and Adulterated Food (21 U.S.C. § 331(k)) the Defendant shall forfeit to the United States of America all property, real or personal, which constitutes or is derived from proceeds traceable to said violation(s) including, but not limited to:

a. 2,041,046,571.535848 in Shiba Inu Crypto Currency seized from Coinbase Account ending in cb0a2 in the name of Casey Martin

b. $9,020.57 seized from Wells Fargo Bank Account ending in 7613 in the name of Casey Martin seized on December 21, 2021.

    c. $9.63 seized from Wells Fargo Bank Account ending in 2983 in the name of Armed Sports seized on December 21, 2021.

**MONEY JUDGMENT AND SUBSTITUTE ASSETS**

The United States will seek imposition of a money judgment against the Defendant. If any of the property described above, as a result of any act or omission of the Defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

A TRUE BILL:

*Original Signature on File*
_____
Grand Jury Foreperson


        ALAMDAR S. HAMDANI
        UNITED STATES ATTORNEY

*Cynthia A. Villanueva*
_____
        CYNTHIA A. VILLANUEVA
ASSISTANT UNITED STATES ATTORNEY